IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | *   CRIMINAL NO. BAH-24-289 |
| | * |
| PRAVEEN MORGAN, | * |
| | * |
| Defendant. | * |
| | * |

*******

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its undersigned attorneys, respectfully submits this memorandum in advance of the sentencing hearing for Defendant Praveen Morgan, currently set for March 10, 2026. For the reasons set forth below, the government submits that the three-point sentencing enhancement for the Defendant's role in the offense applies and that a sentence of 84 months' incarceration is sufficient, but not greater than necessary, to fulfill the goals of sentencing set forth in 18 U.S.C. § 3553(a).

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

The Defendant played a key part in a sprawling drug distribution and money laundering conspiracy that stretched across the United States and beyond. In his role directly under co-Defendant Michael Micklos—one of the ringleaders of the conspiracy—the Defendant managed key aspects of the marijuana distribution scheme and supervised multiple subordinates.

**A. Procedural History**

On October 9, 2024, a federal grand jury for the District of Maryland returned a Superseding Indictment charging the Defendant with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h) (Count One), and Conspiracy to Distribute Marihuana, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C) (Count Two). ECF No. 112.

On November 18, 2025, the Defendant pled guilty to Count Two of the Superseding Indictment. ECF No. 319. The government noted in the plea agreement that it intended to argue at the time of sentencing for the application of a three-level increase under U.S. Sentencing Guidelines ("U.S.S.G.") §3B1.1(b). *Id.* at ¶ 7.b. The Defendant noted his opposition to the enhancement. *Id.*

### B. The Micklos/Xu Drug Trafficking and Money Laundering Organization.

The conspiracy at the heart of this case did not occur in a void. As more states have loosened restrictions on marijuana, the illegal market has remained robust and has largely been taken over by Chinese criminal organizations. *See Invasion of the Homeland: How China Is Using Illegal Marijuana to Build a Criminal Network Across America: Hearing Before the Subcomm. on Oversight, Investigations, and Accountability of the H. Comm. On Homeland Security*, 119th Cong. (Sept. 18, 2025) (witness statements); *Marijuana and Mexican Cartels: Inside the Stunning Rise of Chinese Money Launderers*, NBC News (Aug. 3, 2024), https://www.nbcnews.com/investigations/marijuana-mexican-cartels-stunning-rise-chinese-money-launderers-rcna158030; Sebastian Rotella et al., *Gangsters, Money and Murder: How Chinese Organized Crime Is Dominating America's Illegal Marijuana Market*, ProPublica (March 14, 2024), https://www.propublica.org/article/chinese-organized-crime-us-marijuana-market. These marijuana distribution and money laundering organizations exploit the "gray area" inhabited by marijuana in states where its cultivation and sale have been legalized to grow their networks and operate with less interference from regulatory authorities.

But despite the evolving regulatory environment around marijuana,[1] the defendants in this case were not operating in a "gray area." The defendants did not merely fail to fill out the proper

---

[1] The government notes, for the Court's awareness, that the President recently issued an executive order directing the Attorney General to take "all necessary steps" to reschedule marijuana as a

forms for a medical marijuana dispensary in Maryland or elsewhere. Nor did they simply prefer to conduct their financial dealings outside of traditional channels. This was at all times an illegal drug distribution operation that involved growing and moving many tons of marijuana throughout the United States and laundering millions of dollars of proceeds from that distribution.

In general, the distribution and laundering scheme worked as follows: Co-defendants Michael Micklos and Malik Bridgers[2] distributed large amounts of marijuana in Maryland and elsewhere. Their primary source of supply for the marijuana and primary method of laundering the proceeds of their sales was a network overseen by co-defendant Can Xu. Co-conspirators in Xu's network managed large-scale marijuana cultivation operations in numerous states, such as Washington, Oregon, and Maine. Other members of Xu's network managed the transportation of bulk quantities of marijuana through a network of couriers, such as the Defendant. Micklos' and Bridgers' organizations then distributed the marijuana, using Telegram to advertise the strains and prices (on average, selling for roughly $1,000 per pound of marijuana), and the same network of couriers transported the proceeds back to Xu's network to be laundered further, often by sending money to the same people who had initially supplied the marijuana as payment for further supply. Over the course of the investigation, agents seized over $6 million in proceeds and over 1,000 kilograms of marijuana connected to the scheme.

---

Schedule III controlled substance. Exec. Order No. 14,370, 90 Fed. Reg. 60,541 (Dec. 18, 2025). The order is directed only at relaxing restrictions around marijuana's potential medical uses and research. It is completely silent as to criminal enforcement. And as is the case with ketamine (another Schedule III controlled substance), distribution of marijuana outside those limited medical contexts will remain illegal, even after rescheduling. In other words, since the defendants in this case were not purporting to be medical researchers or to be opening medical dispensaries, the pending rescheduling of marijuana has no impact on sentencing considerations.

[2] Although Bridgers initially worked for Micklos, he eventually split off and distributed marijuana through his own organization, where he continued to use the general methods and pattern of distribution that Micklos used.

**C. The Defendant's Role: Managing the Telegram Account and "Shop Phones," Arranging Orders, Supervising Subordinate Co-Conspirators, and Maintaining Ledgers.**

Defendant Praveen Morgan served as Micklos' right-hand man and was responsible for several key functions in the organization, including: managing Micklos' Telegram account; managing the "shop phones" used to receive orders; instructing subordinates like co-defendants Michael Tilmon and Steven Mack regarding ordering logistics, transportation of drugs and proceeds, and accounting; and monitoring the organization's sales and drug supply through ledgers. *See* Plea Agreement, ECF No. 319 at 9–12. Over the course of the investigation, surveillance, calls, and other evidence established the Defendant's crucial role in the conspiracy.

Telegram was the primary method by which Micklos advertised his organization's marijuana supply. The organization's Telegram account displayed the amounts, types, and prices of marijuana available for sale, as well as contact information for one of the shop phones to place an order. The account was updated on a continuous basis to reflect changing inventory. On May 15, 2024, agents intercepted a call between Micklos and the Defendant in which the two discussed how to address someone deleting information from the account they had been using. Ex. 1. During the call, Micklos said he would "make a new Telegram" with himself and the Defendant as the "owners" of the new account. *Id.* Micklos then instructed the Defendant to send the new link to all their customers.

When a customer wanted to place an order based on what they had seen on Telegram, they usually sent a text message to the provided phone number, which was for one of the "shop phones" that the Defendant kept—and that were seized from his residence when he was arrested. The Defendant was responsible for monitoring the shop phones and communicating the logistics of approved orders to both the customers and subordinate co-conspirators, who would handle the physical sales. When the sales went forward, the subordinates had to confirm payment receipt

with the Defendant, who was also responsible for checking in with various subordinate co-conspirators on a regular basis to confirm their revenue and inventory numbers.

There are several examples of text messages from the shop phones showing the Defendant's role in supervising the placement and completion of orders for the organization. For instance, on March 5, 2024, the Defendant instructed a customer that "all customers pay first (in person) before getting their order." Ex. 2. The Defendant then told the customer that they would "link w my team member pay for your order and then another team member will bring out order after." *Id.* A similar message was sent on March 22, 2024, in which the Defendant confirmed the specifics of a $4,150 order that would be picked up that day or the next. Ex. 3. The Defendant instructed the customer, "[Y]ou will get a call on where to pickup your order so pls answer the phone from ALL NUMBERS as it may be a call about your order from my team." *Id.* And in a follow-up message sent that day to the same customer, the Defendant provided a phone number for co-defendant Michael Tilmon, identifying it as "my man number who has your order." Ex. 4. The Defendant then instructed the customer, "[T]ext him your name.. your order and let him if your available to pick up your order and he'll give you a timeframe." *Id.* After the Defendant's "team" (Tilmon and others) successfully conducted a planned transaction, the Defendant would receive a confirmation of payment, usually in the form of a "thumbs up" emoji.

Prior to his arrest in May 2024, Tilmon and the rest of the Defendant's team in Baltimore were consistently supervised by the Defendant in connection with drug orders. In one intercepted call from March 13, 2024, an unindicted co-conspirator ("CC-1") called Tilmon after he "just got off the phone with Veen [the Defendant]." Ex. 5. Tilmon and CC-1 complained about the unspecified "last minute" instructions from the Defendant and agreed that things could wait until the next day because CC-1 was "busy anyway." *Id.*

5

After Tilmon was arrested, the Defendant began directly communicating, at Micklos' instruction, with another Baltimore team member, co-defendant Steven Mack (often referred to as "Gustavo" by other co-conspirators). In one call from June 11, 2024, Micklos instructed the Defendant to start reaching out directly to co-conspirators who had not responded to a "group message." Ex. 6. Micklos specifically told the Defendant that this should be done because outreach from the Defendant would be from "someone official." *Id.* Micklos also asked the Defendant to do a regular tally of sales to keep track of inventory and profit, based on how the organization "started doing everything different with Gustavo [Mack]." *Id.* Later in the call, the Defendant said that Mack had told him he had multiple "people" lined up for the next day, and Micklos said he would call Mack directly. *Id.*

In another example, on June 13, 2024, Micklos had a further conversation with the Defendant about the status of business in New York and Baltimore. Ex. 7. In particular, Micklos asked the Defendant whether "New York orders are going good," and the Defendant confirmed they were. *Id.* Later in the call, Micklos asked the Defendant whether "we sold anything yesterday." *Id.* The Defendant said he needed to "call Gustavo [Mack]," and Micklos told the Defendant to "ask Gustavo if anybody was hit." *Id.* Micklos also asked the Defendant to "make sure you're doing the inventory and the money count daily with [unindicted co-conspirator]" because Micklos needed to "make sure everything's right." *Id.* After the Defendant affirmed he would, Micklos reminded him that he was responsible for confirming the daily inventory and money count checks. *Id.* As seen in other videos—and confirmed when the ledger was seized from the Defendant's residence—this likely referred to Morgan's job of keeping a detailed ledger of inventory and sales for Micklos' organization. ECF No. 319 at 10.

And on August 5, 2024, during a similar call, Micklos and Morgan had a detailed discussion about inventories and sales from various subordinates in the conspiracy. Ex. 8. Micklos initially asked for specific numbers related to one unindicted co-conspirator's ("CC-2") order. *Id.* The Defendant noted that he had "everything in that notebook," and after finding the relevant records told Micklos that CC-2 had given $94,250 for an order costing $84,575. *Id.* Micklos then asked the Defendant to confirm that "this was what Gustavo [Mack] counted, not what [CC-2] said he gave," which the Defendant said was correct. *Id.* Later, after discussing the "leftover" inventory that the Defendant would re-price for sale, the Defendant said he needed to "get organized with Gustavo [Mack]" and that he had talked with Mack earlier about inventory and sales. *Id.*

Throughout the conspiracy, the Defendant's activity described above and in the plea agreement—such as his direct role in receiving combined proceeds from sales at Micklos' own residence, *see* ECF No. 319 at 9–10—placed him squarely in the conspiracy as Micklos' second-in-command. Micklos relied on the Defendant to ensure that his large-scale marijuana trafficking business could continue to make significant and regular sales and to directly supervise subordinates, just as any legitimate retail store would rely on a manager.

## II. MANAGERIAL OR SUPERVISORY ROLE ENHANCEMENT UNDER U.S.S.G. §3B1.1(B)

### A. Legal Standard

Under U.S.S.G. §3B1.1(b), the Court shall increase the Defendant's Guidelines offense level by three points if the government establishes by a preponderance of the evidence that the Defendant "was a manager or supervisor" of criminal activity that "involved five or more participants or was otherwise extensive." *See United States v. Urrego-Linares*, 879 F.2d 1234, 1238–39 (4th Cir. 1989) (holding that preponderance of the evidence is the applicable standard for

deciding Guidelines application issues), *cert. denied*, 493 U.S. 943 (1989). The role enhancement applies when the government establishes that the Defendant "controlled the activities of other participants" or "exercised management responsibility" within the conspiracy. *United States v. Pliego-Pineda*, 129 F.4th 263, 270 (4th Cir. 2025) (quoting *United States v. Bartley*, 230 F.3d 667, 673–74 (4th Cir. 2000)), *cert. denied*, 145 S.Ct. 2805 (2025). And Application Note 2 to U.S.S.G. §3B1.1 "make[s] clear the management or supervision of just one participant alone renders the enhancement appropriate." *Id.*; *see also United States v. Hamilton*, 657 F. App'x 219, 220–21 ("This is 'not a particularly onerous showing,' requiring 'only a conclusion that [the defendant] supervised at least one . . . participant,' and it 'does not require the court to identify specific examples.'") (quoting *United States v. Hamilton*, 587 F.3d 1199, 1222 (10th Cir. 2009)).

The Fourth Circuit instructs trial courts to consider seven factors identified in the commentary to U.S.S.G. §3B1.1 when determining whether a defendant qualifies for this enhancement:

> [1] the exercise of decision making authority, [2] the nature of participation in the commission of the offense, [3] the recruitment of accomplices, [4] the claimed right to a larger share of the fruits of the crime, [5] the degree of participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others.

*United States v. Burnley*, 988 F.3d 184, 188 (4th Cir. 2021).

Numerous cases have established how the seven factors should be considered and how this enhancement should be applied in the specific context of a drug trafficking conspiracy. For example, deciding whether to trust particular customers and to arrange sales, as well as serving as the primary connection between buyers and suppliers are indicative of a manager/supervisor-level of decision-making authority and participation in the offense. *See Pliego-Pineda*, 129 F.4th at 270. Arranging deliveries and managing proceeds and drug supply also indicate a "high degree of

participation in organizing the offense." *Id.* The Fourth Circuit has routinely "approved of the enhancement where defendants directed organized drug trafficking by managing and advising street-level dealers, setting prices and payment terms, and arranging acquisition and delivery logistics." *Burnley*, 988 F.3d at 188 (citing multiple prior cases holding the same); *cf. United States v. Slade*, 631 F.3d 185, 190 (4th Cir. 2011) (finding that application of the enhancement was improper for a defendant who sold drugs to "both his own clientele and to other members of the conspiracy, who, in turn, sold the drugs to their clientele"). Ultimately, the enhancement is appropriate when a defendant "arrang[ed] the logistics of [marijuana] deliveries or payments" and "coordinate[d] the activities of others." *United States v. Bartley*, 230 F.3d 667, 673 (4th Cir. 2000) (alterations in original) (quoting *United States v. Vargas*, 16 F.3d 155, 160 (7th Cir. 1994)).

### B. The Defendant's Conduct Meets the Criteria for Applying the Manager/Supervisor Enhancement.

As a threshold matter, the offense of conviction involved a conspiracy involving five or more participants. U.S.S.G. §3B1.1(b). The Defendant's plea agreement alone identifies six participants. ECF No. 319 at 9–12. And sixteen defendants were charged in Count Two of the Superseding Indictment, to which the Defendant has pled guilty. ECF No. 112.

The Defendant's running of the day-to-day operations of Micklos' organization are directly in line with conduct that the Fourth Circuit has said qualifies for application of a role enhancement under U.S.S.G. §3B1.1(b). The Defendant was responsible for supervising the organization's regional dealers, such as Tilmon and Mack, by ensuring those subordinates were adequately supplied, that their sales were counted, and that they were properly instructed as to how to conduct sales. That finding, standing alone, is sufficient to warrant the enhancement. *Pliego-Pineda*, 129 F.4th at 270 ("Indeed, the Guidelines make clear the management or supervision of just one participant alone renders the enhancement appropriate.").

Additional analysis of the seven factors, U.S.S.G. §3B1.1 cmt. n.4, makes clear that the Defendant qualifies as a manager or supervisor:

- Exercise of Decision Making Authority: The Defendant was the only person, besides Micklos himself, with authority to access and alter the Telegram account used to conduct sales. *See* Ex. 1 (call in which Micklos said the "owners" of the account would be himself and the Defendant). The Defendant had sole authority to approve sales and communicate the logistics of sales to customers and his subordinates within the organization. *See Pliego-Pineda*, 129 F.4th at 270; *Burnley*, 988 F.3d at 188. The Defendant acknowledged his own supervisory role in communications with customers. *See* Exs. 2 and 3 (text messages referring to "my team" and "my team member" in explaining how sales would be conducted).

- Nature of Participation in the Offense: The Defendant participated extensively in the offense, coordinating sales and managing the books for Micklos' organization on a daily basis. *See* Exs. 2–4, 6–8 (text messages and calls showing the Defendant's responsibility for arranging logistics of sales and keeping up-to-date records of sales based on communications with subordinate co-conspirators); *Bartley*, 230 F.3d at 673 (defendant arranged logistics of marijuana deliveries or payments). He was the primary point of contact for connecting buyers to his "team" for sales. *See* Exs. 2–4; *Pliego-Pineda*, 129 F.4th at 270 (defendant was the "organization's primary contact" who connected supplier with buyers).

- Recruitment of Accomplices and Claimed Right to a Larger Share of the Fruits of the Crime: There is little direct evidence regarding these factors, and they do not carry weight in either direction.

10

- <u>Degree of Participation in Planning or Organizing the Offense</u>: The Defendant functioned as the bookkeeper for the organization and was the primary point of contact for both buyers and sellers. *See* Exs. 2–8. He was responsible for organizing drug sales, managing the proceeds of those sales, and keeping track of drug supply. *See Pliego-Pineda*, 129 F.4th at 270 (defendant had a "high degree of participation in organizing the offense" when he arranged drug deliveries, fronted supply, accepted payments, managed proceeds, and oversaw supply issues).

- <u>Nature and Scope of the Illegal Activity</u>: The conspiracy spanned numerous states and included some transnational elements. Over the course of investigating the conspiracy, agents seized over 2,300 pounds of marijuana and over $6,000,000 in drug trafficking proceeds. ECF No. 319 at 12. The scope and nature of the drug trafficking activity in this case was massive.

- <u>Degree of Control and Authority Exercised Over Others</u>: The Defendant exercised a high degree of authority over others, even leading some of his subordinates to complain about things like unreasonable timetables set by the Defendant. *See* Ex. 5 (Tilmon and CC-1 complaining about "last-minute" nature of instructions from the Defendant). When Micklos needed subordinates in the organization to know that a communication was coming from "someone official," he asked the Defendant to reach out to them directly. Ex. 6. And the Defendant identified Tilmon and others conducting the in-person sales as his "team." Exs. 2 and 3.

Taken together, all the factors articulated in the Guidelines commentary show that the Defendant acted as a manager or supervisor of the extensive drug trafficking conspiracy to which he has pled guilty. The three-point enhancement should apply.

### III. U.S. SENTENCING GUIDELINES CALCULATION AND CRIMINAL HISTORY CATEGORY

As set forth in the Presentence Investigation Report ("PSR") ¶¶ 32–42, the Defendant's U.S.S.G. offense level is calculated as follows:

- **Base Offense Level**: The Defendant's base offense level is 30, because the amount of marihuana attributable to the conspiracy was more than 1,000 kilograms but less than 3,000 kilograms. U.S.S.G. §2D1.1(a)(5) and (c)(5).

- **3-Level Enhancement**: The Defendant receives a 3-level increase because the Defendant was a manager or supervisor (but not an organizer or leader), and the criminal activity involved five or more participants or was otherwise extensive. U.S.S.G. §3B1.1(b).

- **3-Level Reduction**: The Defendant receives a further 2-level reduction for acceptance of personal responsibility, and the Government will further move for an additional 1-level reduction for timely notification of his intention to enter a plea of guilty. U.S.S.G. § 3E1.1(a) and (b).

The Defendant's final adjusted offense level is therefore 30. PSR ¶ 42.

The Defendant has no criminal convictions and receives no Criminal History Points under the Guidelines. The Defendant's Criminal History Category is therefore I.

Based on his calculated offense level of 30 and Criminal History Category of I, the recommended Guidelines range is 97-121 months' incarceration.

### IV. SENTENCING RECOMMENDATION AND 18 U.S.C. § 3553(A) FACTORS

The government submits that the appropriate sentence for the Defendant is 84 months' incarceration. This sentence serves the goals set forth in 18 U.S.C. § 3553(a). It captures the seriousness and scope of the drug trafficking conspiracy, while balancing that with mitigating factors. It further affords appropriate deterrence to the Defendant and to others engaged in similar lines of criminal conduct. And it avoids unwarranted sentencing disparities.

A. **The Recommended Sentence Balances the Seriousness of the Offense and the Need to Protect the Public with the Defendant's Lack of Criminal History.**

The overall scheme charged in this case is extremely serious. The scope of the defendants' drug distribution and related money laundering activity was extensive and complex. The Defendant played a crucial role in the criminal conduct, managing sales and inventory in a multi-state marijuana distribution scheme. The specifics of the conspiracy and the Defendant's role have been addressed in detail previously, and the government incorporates those specifics here by reference. *See* Sections I and II, *supra*.

The "elephant in the room" bears further discussion: This is an offense involving the distribution of marijuana and only marijuana. As discussed above, Section I.B, *supra*, restrictions around marijuana have been loosened in many states, reflecting changing attitudes regarding the harmfulness of the drug. At the same time, previously strong proponents of marijuana legalization have tempered their views after finding that the harms of an unregulated marijuana market are worse than had been predicted:

> [W]ider use has caused a rise in addiction and other problems. Each year, nearly 2.8 million people in the United States suffer from cannabinoid hyperemesis syndrome, which causes severe vomiting and stomach pain. More people have also ended up in hospitals with marijuana-linked paranoia and chronic psychotic disorders. Bystanders have also been hurt, including by people driving under the influence of pot.

N.Y. Times Editorial Board, *It's Time for America to Admit That It Has a Marijuana Problem*, N.Y. Times (Feb. 9, 2026), https://www.nytimes.com/2026/02/09/opinion/regulate-legalized-marijuana.html. To be sure, marijuana is not fentanyl, and no one is suggesting that *Reefer Madness* was a documentary. But there is harm.

Amidst this backdrop, the recommended sentence of 84 months—a downward variance from the Guidelines range—takes into account both the vast scale and seriousness of the drug

13

trafficking conspiracy and the specific nature of the drug that was trafficked. It also factors in the need to protect the public, without overstating the danger posed by the Defendant's activities. And the proposed sentence balances these needs with the Defendant's lack of prior criminal history.

### B. The Recommended Sentence Affords Adequate Deterrence.

As mentioned previously, Section I.B, *supra*, illegal marijuana distribution networks like the one the Defendant participated in have flourished in the wake of loosened regulations. One of the reasons for the quick and significant spread of these criminal enterprises has been the perceived lack of enforcement surrounding marijuana-related offenses. That perception certainly appears to have motivated Micklos and his co-conspirators to brazenly advertise their activities and their official Telegram sales channel on social media. The sentence the Court imposes in this matter should send a clear message that federal law will be enforced against these kinds of wide-ranging marijuana distribution schemes.

The proposed sentence achieves that goal of deterrence while still being more lenient than the Guidelines recommendation. It sends a specific message to the Defendant that he cannot continue to engage in drug trafficking—even of "lesser" controlled substances—once released. And it sends a general message to others engaged in the same activity that they cannot operate their illegal distribution networks with impunity.

### C. The Recommended Sentence Avoids Unwanted Sentence Disparities.

The Court has already sentenced two co-defendants in this matter, Huayi Zhong and William Brown, III. As explained in the related sentencing memoranda—and as stated plainly during each of their sentencing hearings—those two defendants were both couriers who were at the lowest level of culpability among all the defendants charged in this matter. As a result, the Court accepted plea agreements to probationary sentences for both.

The Defendant was a not a courier. He was not one step up from a courier. He was a significant player in the conspiracy, acting as a high-level manager within the marijuana distribution scheme. A sentence of 84 months' incarceration reflects the Defendant's level of culpability and will ensure that the Court can impose adequate and just sentences on co-defendants whose culpability falls somewhere between the couriers and the managers of the scheme.

Additionally, as noted in the PSR, a check of the U.S. Sentencing Commission's Judiciary Sentencing Information database shows that similarly situated defendants received an average sentence of 98 months' incarceration and a median sentence of 103 months' incarceration. PSR at 18. To be sure, the data for comparison is small—only six defendants over the past five years—but it provides enough information for the Court to determine what a "disparate" sentence would look like. The government's proposed sentence of 84 months' incarceration, in addition to being below the Guidelines recommendation, is also more lenient than the average sentence imposed on those defendants by more than a year. Varying any lower would result in too great a disparity in sentences between similarly situated defendants.

### V.     CONCLUSION

For all the foregoing reasons, the government respectfully requests that the Court impose a sentence of 84 months' incarceration, which is sufficient, but not greater than necessary, to meet the sentencing goals of 18 U.S.C. § 3553(a).

    Respectfully Submitted,

    Kelly O. Hayes
    United States Attorney

      /s/
    Alexander Levin
    Assistant United States Attorney